[No. 22935.   Department One.   April 24, 1931.]

FARMERS BANK OF WESTON, *Appellant,* v. F. M. BALCOM COMPANY, *Respondent,* JACK H. GRAFTON, *Defendant.*[1]

[1]Reported in 298 Pac. 435.

*J. G. Thomas, W. A. Toner,* and *McMicken, Ramsey, Rupp & Schweppe,* for appellant.

*Richards, Gilbert & Conklin,* for respondent.

PARKER, J.—The plaintiff bank seeks recovery from the defendants, Grafton and Balcom Company, upon two sight drafts drawn by Grafton upon Balcom Company, payable to the bank, one for $6,500, dated and delivered to the bank on May 6, 1926, and the other for $3,500, dated and delivered to the bank on May 19, 1926. A trial upon the merits in the superior court for Yakima county, sitting without a jury, resulted in findings and judgment awarding to the bank recovery against Grafton, and denying to it recovery against Balcom Company. The bank has appealed to this court from the judgment in so far as it is denied recovery against Balcom Company. The theory of the claim of recovery is, speaking generally, that the drafts created indebtedness owing to the bank by Balcom Company as well as by Grafton, because of their business relations in a joint venture, and the drawing of the drafts being a transaction in such venture.

The record is voluminous, and accompanied by many exhibits, presenting in detail a somewhat involved state of facts. We think, however, the following summary of the outstanding, controlling facts is sufficient for the purpose of our present inquiry: During the years 1925 and 1926, Grafton was a dealer in potatoes, located at the town of Weston, Oregon. His business appears to have been largely, if not wholly, in buying potatoes from growers and disposing of them to dealers elsewhere. Balcom Company was, during those years, a dealer in potatoes, located at Grandview, Washington. On August 14, 1925, Grafton entered into a contract with Balcom Company, reading, so far as need be here noticed, as follows:

"Grandview, Wash.
August 14, 1925.

"I hereby sell to F. M. Balcom Co. of Grandview, Wash., on a joint account basis about 20 cars of Weston Mountain netted gem seed potatoes as per specifications covered in contracts now held by me from growers in Weston, Oregon, copy of which is hereinafter included.

"It is understood that these potatoes will be shipped during the months of October and November, 1925, same to be accepted and paid for by the F. M. Balcom Co. according to the terms of the above mentioned contract [s].

"The F. M. Balcom Co. hereby advances $700.00 receipt of which is hereby acknowledged.

(Copy of Contract)
" 'Weston, Oregon.
..............................................................., 1925.

" 'The undersigned......................................................of Weston, Oregon, hereinafter called the seller, agrees to sell and Jack H. Grafton of Corvallis, Oregon, hereinafter called the purchaser agrees to buy.............................tons of netted gem seed potatoes sorted to the requirements of Oregon Standard seed grade except as to size, to be delivered during the months of October and November, 1925, at the option of the seller F. O. B. cars at Weston,

Oregon, and to be paid for at the rate of $30.00 dollars per T. The purchaser agrees to deposit in the Farmers Bank of Weston to the credit of the seller............................. dollars on or before the......................day of.........................., 1925, as part payment hereon. The balance to be paid when delivery is completed. The purchaser agrees to buy and the seller agrees to sell the balance of the potatoes planted by the seller and now growing on .............................acres of land used by the seller according to the time grade and price above mentioned except ............................ sacks to be reserved by the seller for his own seed purposes. The seller agrees to rogue out all undesirable plants and do everything possible to meet requirements for Oregon certification. . . .

''(Signed) Seller-Purchaser'

''Jack H. Grafton.''

The embodying in this contract of the form of the growers' sale contracts with Grafton, was manifestly to make certain the quality of the potatoes and the price to be paid by Balcom Company to Grafton for the potatoes. Balcom Company did not sign this contract, but adopted and acted upon it.

The bank, an Oregon banking corporation, during the years 1925 and 1926, maintained its banking business at Weston, Oregon, and Grafton commenced to do business with it, as its depositor and customer, at least two months prior to his entering into the above quoted contract with Balcom Company. Soon after the entering into of that contract Grafton deposited in the bank the seven hundred dollars he received as an advance from Balcom Company under the contract, and exhibited the contract to the cashier of the bank, leaving a copy of it with the bank; this evidently to the end that the bank would be better informed as to his business and its prospects, it being contemplated that he would desire and receive loans from the bank to aid him in his business.

Commencing on October 19, 1925, and continuing up to November 16, 1925, Grafton shipped to Balcom Company thirty-seven cars of potatoes, which he had purchased from growers, which shipments were received by Balcom Company, and for which it fully paid Grafton, also paying him his share of the profits over and above the purchase price. These payments were made to Grafton partly by check from Balcom Company, and partly by Balcom Company honoring drafts upon it by Grafton, payable to the bank. The checks were deposited by Grafton in the bank, for which he accordingly received credit, and he also received credit for the drafts as deposits at the time he drew them.

No further business was done by Grafton with Balcom Company until April 6, 1926. Between that date and May 11, 1926, he had purchased from growers and had shipped to Balcom Company twenty cars of potatoes. These were all paid for by Balcom Company at an agreed purchase price, but, they being for sale by Balcom Company on joint account, and there being a loss in the disposition of them by Balcom Company because of the falling market, Grafton, instead of having a profit to share in, was left indebted to Balcom Company for his share of the loss. The payments for those shipments were made to Grafton by checks and drafts as the former shipments had been paid for, which payments were deposited in the bank to Grafton's credit.

During the years 1925 and 1926, Grafton did a large additional business with growers from whom he purchased potatoes, and with others to whom he sold the potatoes, the whole of the business he did with Balcom Company being not over one-fourth in value of his entire business. The whole of his business was financed through the bank; that is, the receipts and disbursements thereof were through his deposit account in the

bank. When he did not have sufficient deposit credit to pay for his purchases, his deposit credit was increased by loans made to him by the bank, evidenced by his notes.

The shipments to Balcom Company and the settlements therefor, above noticed, constituted the whole of the business done by Grafton with Balcom Company. None of the drafts drawn by Grafton on Balcom Company was drawn against any shipment; that is, they were not accompanied by any shipping documents, and none of them was in the same amount of the purchase price of any one or more shipments. The same may be said of the checks from Balcom Company to Grafton. The drafts, so far as honored by Balcom Company, and its checks given to Grafton, were all mere payments to Grafton on account, and all were deposited in the bank and used by Grafton indiscriminately in his potato dealings.

On May 6, 1926, Grafton drew a sight draft on Balcom Company, payable to the bank, for $6,500, delivered it to the bank, and received credit therefor on his deposit account. On May 19, 1926, Grafton drew another sight draft on Balcom Company, payable to the bank, for $3,500, delivered it to the bank, and received credit therefor on his deposit account. At those times, and since then, Balcom Company was not and has not been indebted to Grafton in any sum. Acceptance of these drafts being refused by Balcom Company upon presentation by the bank, and Grafton not paying them or the indebtedness they represent as owing the bank, it commenced this action, seeking recovery of the amount of both drafts from both Balcom Company and Grafton.

Were Grafton and Balcom Company engaged in a joint venture? We may concede that they were so engaged in the sales by Balcom Company of the pota-

toes sold to it by Grafton; that is, that each was to share in the profits and losses so made or suffered. We are of the opinion, however, that, in the purchase of the potatoes by Grafton from the growers, and in the sales of the potatoes by Grafton to Balcom Company, there was not a joint venture. It seems plain that, in the purchase of the potatoes by Grafton from the growers, there was no element of agency such as exists between joint adventurers or partners.

The original contract for the sale of the potatoes from Grafton to Balcom Company manifestly was a sale of potatoes in existence, or, at all events, already purchased under contracts between Grafton and the growers; and, while additional potatoes were sold by Grafton to Balcom Company in the spring of 1926 (we assume upon the same joint account conditions), there is nothing in this record showing that Balcom Company authorized Grafton to purchase for it, or for it and Grafton jointly, any potatoes at any time. All potatoes acquired by Grafton and sold by him to Balcom Company, as well as all other potatoes, much more in quantity, acquired by Grafton and sold by him to others, were acquired by him wholly apart from any joint venture or agency relationship with Balcom Company. Grafton was not buying potatoes as agent of Balcom Company, or as a joint adventurer with Balcom Company, at any time.

What knowledge of the business relations between Grafton and Balcom Company did the officers of the bank have which could lead them to the reasonable belief that Grafton and Balcom Company were engaged in a joint venture, other than in their mere sharing in the profits or losses incident to the sales by Balcom Company of the potatoes sold to it by Grafton? The bank's officers were advised of that relation by the terms of the contract between Grafton and Balcom

Company, having been shown the original, and received a copy of that contract, soon after its making. Its terms did not suggest that Balcom Company had the least interest in the purchase of the potatoes by Grafton from the growers. Nor, assuming that the additional potatoes sold by Grafton to Balcom Company were sold under the same conditions as recited in the original contract, do its terms suggest that Balcom Company had any interest in the purchase of potatoes by Grafton from the growers.

When Grafton drew the drafts upon Balcom Company, delivered them to the bank and received credit therefor on his deposit account, that was, in legal effect, a borrowing by him from the bank of those amounts; and, of course, upon the face of the drafts, no one but Grafton ever became liable thereon. Balcom Company, not having accepted them, of course, did not become liable for the indebtedness they represented, unless it became liable therefor because that indebtedness was authoritatively contracted by Grafton as an indebtedness of the joint venture engaged in by Grafton and Balcom Company.

We are unable to see that Grafton so contracted or intended to so contract, or that the bank had any reasonable cause to regard him as so contracting. That loan was so acquired from the bank by Grafton for his use in his potato business, a business in which Balcom Company had no interest, just as Grafton had on numerous prior occasions acquired loans from the bank to use in his business of which, as we have noticed, his dealings with Balcom Company were a minor part.

Did the previous honoring of a number of drafts by Balcom Company, drawn upon it by Grafton and payable to the bank, give to the bank such as-

surance that these drafts would be honored by Balcom Company as to render it legally liable to honor them? We do not think so under the facts here appearing. The drafts were not drawn to obtain funds to promote the joint venture, and the bank had no reasonable cause to believe they were drawn for that purpose. Prior honored drafts were drawn to obtain payment on account of the purchase price of potatoes sold by Grafton to Balcom Company, and were honored because Balcom Company was indebted, or possibly about to become indebted, to Grafton, in excess of the amounts of such drafts. The bank had no reason to believe that Balcom Company would consider itself bound to honor any drafts in excess of such indebtedness to Grafton.

Our decision in *Seattle Shoe Co. v. Packard,* 43 Wash. 527, 86 Pac. 845, 117 Am. St. 1064, supports this conclusion. In that case, there was drawn in question the obligation of respondents Packard *et al.,* a wholesale concern, to honor a draft drawn upon them by one of their travelling salesmen, payable to appellant shoe company, Packard *et al.,* having previously honored such drafts. Holding that Packard *et al.,* were not liable upon the draft in question, Judge Dunbar, speaking for the court, said:

"But there was no authority of agency established here. The only presumption that could arise from the payment of drafts was the presumption that the maker of the draft had credit with the respondents at the time the draft was presented. It would be a dangerous doctrine to announce that the honoring of a draft, or even of several drafts, during a period in which the maker of the drafts had funds in the hands of the drawee, would establish an agency under the authority of which the maker could draw on the drawee *ad libitum.* So far as this case is concerned, so long as Smith had credit with the respondents, his drafts were honored. When the credit was extinguished, the re-

spondents acted within their rights by refusing to pay the drafts. The legal assent to, and acceptance of, a bill are specially set forth in § 132 of the same act, [§ 3522, Rem. Comp. Stat.], as follows:

" 'The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer. The acceptance must be in writing and signed by the drawee.'

"The acceptance not having been in writing, and there having been no authority shown for the issuance of the draft, the court committed no error in granting the nonsuit.''

It seems to us that the bank in this case had no better ground to assume that Balcom Company would honor these drafts than the shoe company had in that case.

The argument of counsel, as the evidence upon the trial, has taken a wide range, accompanied by citation of many authorities. It seems to us, however, that our observations above made are all that is necessary to be said in reaching our present conclusion that the judgment of the trial court must be affirmed. The law of joint venture, and agency powers of joint adventurers incident to their ventures, we think, does not need critical exposition here. Its application is really our present problem; which becomes, in this somewhat involved controversy, largely questions of fact. We think the case does not call for further discussion.

The judgment is affirmed.

TOLMAN, C. J., MITCHELL, HOLCOMB, and MAIN, JJ., concur.